Spencer, White & Prentis, Inc. v. Commissioner.
Spencer, White & Prentis, Inc. v. Commissioner
Docket No. 108431.
United States Tax Court
1943 Tax Ct. Memo LEXIS 243; 2 T.C.M. (CCH) 320; T.C.M. (RIA) 43306; June 21, 1943
*243 Edgar A. B. Spencer, Esq., 60 E. 42nd St., New York City, and Thomas P. Morrissey, Esq., for the petitioner. Thomas H. Lewis, Jr., Esq., and Patrick J. Cavanaugh, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner in this proceeding challenges respondent's determination of income and excess-profits tax deficiencies in the amounts of $71,828.41 and $34,049.38, respectively, for the fiscal year July 1, 1937, to June 30, 1938. The question involved is whether petitioner may deduct as incurred or accrued expenses the sum of $327,500.00 for work or services to be performed subsequent to the tax year in issue. Findings of Fact Petitioner is a corporation organized July 16, 1919, and existing under the laws of the State of New York, having its principal office at 10 East 40th Street, New York City. Its tax return for the period in question was filed with the collector of internal revenue, 3rd New York District. Petitioner was engaged in the general construction and engineering business, doing the installation of foundations, the underpinning of buildings, and short-term construction contracts dealing largely with sub-surface and hydraulic *244 conditions. Although the majority of the contracts performed were short-term contracts completed within one year, prior to December 11, 1933, petitioner had been interested in various long-term contracts as consulting engineers, syndicate participants or as contract managers under service contracts. Its books have been kept and returns made for fiscal years beginning on July 1 and ending on the next succeeding June 30, and always, on the accrual basis. On December 11, 1933, petitioner applied to the Commissioner for consent to change its method of accounting and reporting in connection with long-term contracts to the completed contract basis. The application was disapproved because it was not submitted within the ninety days after the beginning of the taxable year. On June 29, 1937, petitioner entered into and in July, 1937, commenced performance of a unit price contract, designated as No. 761 on its books, with the Board of Transportation of the City of New York for subway construction on Route 101, section 6, which was under 6th Avenue from West 9th Street to West 18th Street in Manhattan. Petitioner was engaged in work on this contract among others during the fiscal year involved. *245 The contract required performance of thousands of types of operations, but designated specific prices for only a few items which were known as pay items. In making bids under the contract, petitioner included in the bid price for pay items the cost of performing those operations for which no price was specified, and in this manner distributed the cost of operations not specified as pay items over the pay items to which they were related, or ratably over all the pay items. The non-pay items included such things as the taking up and relaying of sidewalks and roadways, support and maintenance of buildings, water mains and gas pipes, administration and engineering expenses. The contract was subject to a performance bond and provided for progress payments under Articles XXXV and XXXVI, which provided in part as follows: PAYMENTS TO CONTRACTOR ARTICLE XXXV. Partial Estimates. In order to assist the Contractor to prosecute the work advantageously, the [City] Engineer shall, from time to time as the work progresses, but not more often than once a month, make in writing an estimate, such as in his opinion shall be just and fair, of the amount and value of the work done and materials *246 incorporated in the work by the Contractor according to the terms of this contract (but it is understood that in making such estimates the Engineer shall not necessarily be governed by the prices contained in the Schedule of Prices); * * * The first such estimate shall be of the amount and value of the work done and materials incorporated in the work since the Contractor commenced the performance of this contract on his part. Every subsequent estimate except the final estimate shall be of the amount and value of the work done and materials incorporated in the work not included in the last preceding estimate; * * * ARTICLE XXXVI. Not by Strict Measurement. Such estimates shall not be required to be made by strict measurement, but they may be made by measurement or by estimation or partly by one method and partly by the other, and it shall be sufficient if they are approximate only. The first certification of work completed by the city was made approximately three months after commencement of work on the contract and certifications were generally made each month thereafter during the period here involved. Article XXXIII of the contract provided for the retention by the city *247 of 15 percent of the amounts of work certified to be complete as follows: ARTICLE XXXIII. Retained Percentage. (a) In addition and as further security there shall be deducted and retained 15 per centum of the amounts certified from time to time to be due to the Contractor * * *. Such retained percentages shall be held as further security for the faithful performance by the Contractor of all the conditions, covenants, and requirements specified and provided for in this contract. The Contractor may from time to time withdraw portions of the amounts so retained upon depositing with the Comptroller, United States Government securities or corporate stock or bonds of the City of a market value equal to the amount so withdrawn, in which event the provision of this Chapter in respect of securities shall apply to such securities deposited. * * * The city retained 15 percent of the certified amounts in accordance with the above provision. The full amount of retained percentages from the inception of the contract in July, 1937, to June 30, 1938, in the amount shown below, was accrued and entered on petitioner's books as accrued income, and reported on its return as income for the period *248 in question. The certified estimate of work completed to June 11, 1938, was $3,532,121.58, and to July 11, 1938, was $4,013,590.61. There was no separate certification by the city of work completed to June 30, 1938, but by interpolation on the basis of the working days involved - petitioner estimated that to be $3,853,641.43 and the amount earned from June 11 through June 30 to be $321,519.85. That amount was included in petitioners' return as part of its gross income, being the gross receipts from contract No. 761. Part of that amount was considered by petitioner to be accrued income, and the total was made up as follows: (a) Moneys earned under contract,
certified and paid
$3,002,303.34
(b) Amount certified under contract
but retained by the City of
New York pursuant to the
contract
529,818.24
(c) Amounts not yet certified un-
der contract
321,519.85
$3,853,641.43
Because of the inclusion, in the contract price of pay items, of the contract cost of other operations which were not completed at the same time as the particular pay item, the petitioner received certifications for progress payments for pay items completed, which included certain amounts which it considered *249 allocable to operations which would be performed subsequent to the pay items for which progress payments were certified. As of June 30, 1938, petitioner estimated that up to that date the sum of $3,853,641.43 above set forth included payment for certain non-pay operations uncompleted by that date, under the caption "Contract 761 Deferred," and entered on its journal as of June 30, 1938, the following "for incurred expense": 1. Moving off job, clean up, etc. 60%
of $100,000
$ 60,000.00
2. Repairs to buildings damaged by
subway construction and legal
expenses, etc.
50,000.00
3. Completion of excavation by re-
moving braces, timbering, sheet-
ing, installing backfill, 91,500
yards @ 1.25
114,500.00
4. Restoration of subsurface struc-
tures, damages vault construc- m
tion
40,000.00
5. Clean up of East Tunnel caulking
15,000.00
6. Supervision, office expenses for 3
mos.
Electricians, me-
chanics $ 5,000 per mo.
Overhead 10,000 per mo.
Office expense 1,000 per mo.
$16,000 x 3
48,000.00
Total
$327,500.00
The above total of $327,500 was reported on Schedule N (Balance Sheet) of petitioner's return as "Liability to restore property under contracts." It was also included in *250 the cost of operations in Schedule A (Net Income Computation), with a resulting diminution in net income for excess-profits tax computation. Costs of contract No. 761 paid and accrued to June 30, 1938, other than the $327,500 above, amounted to $2,860,110.76 and the total cost paid and accrued with respect to that contract as reported by petitioner was the sum of the two figures. The petitioner's estimate was that the contract was 60 percent complete, whereas after actual completion it was found that the contract was 53.9 percent complete as of June 30, 1938. The sum of $327,500 did not represent obligations to subcontractors, materialmen, labor or any creditor. The work was actually performed after June 30, 1938, at a cost of $339,090.40. In his notice of deficiency respondent denied the deduction of the $327,500, stating: Unallowable deductions and additional income (a) Reserve for expenses $327,500 (a) The deduction of a reserve of $327,500 for future expenses is held to be unallowable under the provisions of Section 42 of the Revenue Act of 1938, and Article 42-4(a), Regulations 101. Opinion The extent to which petitioner's books and tax returns correctly set forth its *251 gross income from the subway contract is not in issue although it returned as income stipulated percentages which under that contract the City of New York reserved the right to and did retain, and which petitioner could not demand or lay claim to as a matter of right until performance was complete; although under those circumstances the liability to pay was not yet sufficiently definite to warrant accrual, , affirmed (C.C.A., 6th Cir.), ; ; although the amounts so withheld were greater than the expense items which petitioner seeks to accrue and deduct, and would more than offset them; and although petitioner's attention was repeatedly drawn to the problem thus involved throughout the progress of the hearing. Nevertheless, petitioner steadfastly refused to place the question in issue, and stood its ground that it was required to report such amounts as income, and that no error existed in that respect and no claim for reduction or elimination of the deficiency was being made on that ground. Respondent *252 not unnaturally made no contrary contention, and we accordingly accept for purposes of this proceeding the hypothesis that no adjustment need or can be made in the gross income reported by petitioner. For similar reasons and under similar circumstances, no further notice need be paid to the "interpolated" accrual for work presumed to have been performed between June 11, 1938, when the work done under the contract was estimated for payment by the parties, and June 30, 1938, the close of petitioner's fiscal year, although here the figures of gross income on the one hand and claimed deduction on the other are so close as to be virtually identical. It does not follow, however, that this aspect of the situation can be overlooked in disposing of petitioner's contention. The explanation given in petitioner's brief for the inclusion of the retained percentage in its reported income is that: These sums were included in income, since part of the expense to earn them was carried into expense paid and accrued. Thus, because some of the expenses of carrying out the contract had actually been paid or incurred and, therefore, were properly accrued, petitioner insists upon returning payments under *253 the contract to which it was not yet entitled, and for the securing of which it would be required to undertake additional obligations. And having returned that income, it insists that such future and unobligated expense must be an appropriate present deduction as an offset against the still inchoate receipts. In claiming the right to deduct estimated future costs of completing the specified phases of the contract, petitioner's primary postulate accordingly is that the obligation to perform the work for which it claims the right of accrual arose not merely because of the contract but essentially by force of the circumstance that the future work in question had been paid for in full in advance. The argument thus runs that since the city had paid for the work but petitioner had not yet performed it, two things followed: First, that there accrued against petitioner a liability and second, that since it had received the money, its net income would be distorted if it did not offset against that the corresponding obligation to render the services for which payment had been received. But we must consider throughout that the basic premise for this reasoning involves the assumption that the *254 work in question had actually been paid for in full, or at least to a sufficient extent so that the cost of completing the remainder of the work would be greater than the payments yet to be received. It must, of course, be conceded that such was clearly not the case to the extent of any actual receipt of cash. Petitioner's assertion is based on its use of the accrual method of bookkeeping. If, however, the payments still to be made were not properly accrued, they no more form the basis for a premise that the work had been paid for in full, even on an accrual system, than would be the case with a cash basis taxpayer where payments in cash or its equivalent had not yet been realized. It follows in the first place, therefore, that in this proceeding there are not before us the necessary facts upon the strength of which the legal contention advanced by petitioner actually can be supported. And if there is any distortion of income, which is by no means clear, it derives from petitioner's voluntary insistence upon returning unaccruable income, rather than upon the failure to permit the accrual of offsetting deductions. This is not to say that were it otherwise there would be a sound legal *255 foundation for a determination in petitioner's favor. In those cases where a question somewhat analogous has arisen, the decisions have been uniform in denying to a taxpayer the privilege of accruing items which are not yet in the form of cash liabilities to ascertainable creditors. Thus, in , affirmed (C.C.A., 2nd Cir.), , the fact that the petitioner was required to make certain repairs and to redecorate and that its monthly rentals were the source of funds for that purpose was not considered sufficient to justify a deduction of the estimated future cost of defraying the expense of renovation in excess of expenditures actually incurred. "Although the petitioners were obligated to renovate they had no liability to pay anyone anything until someone had performed some services. The accrual is for services in renovating, not of the duty to renovate." Similarly, in , an obligation on the part of petitioner to make expenditures for furnishing services for which it had already received payment was *256 not thought to be sufficient to justify either an exclusion of the amount received from its gross income or the deduction as an accrued liability of the proposed expenditures. "But even so, that it [the petitioner] intended and may have been obligated in the taxable year to expend that excess in later years in furnishing the services for which it was paid in the taxable year, affords no basis for an expense accrual in the earlier year. During the taxable year no such expenditure had been made. No item of future expense had been contracted for." See also ; . As respondent not inaptly suggests, the present petitioner "contends that it should be allowed to deduct an obligation to incur expense in some later period * * *." In its main brief petitioner quotes from , to the effect that "the regular and long-standing methods of accounting employed by the taxpayer, established in due course and for no ulterior purpose, are to be indulged." But it takes the wind out of its own sails *257 by conceding in the reply brief that "It is true that this petitioner never before made accruals exactly the same as made at and as of June 30, 1938, and under discussion herein, and the reason therefor is simple. This was the first time that it had carried out in its name a subway contract of the Board of Transportation of the City of New York which required such accrual to be made to properly report income." The evidence showed that other instances asserted by petitioner to be similar were in reality no more than proper accruals of actually incurred expenses. There is some interchange between the parties as to what the effect would have been had petitioner consistently adopted the percentage of completion basis of reporting its income. Since it does not purport to have done so, the discussion is in all likelihood academic. Petitioner complains that an application by it for leave to report on the completed contract basis was denied by respondent. But the denial apparently with respect to an earlier year was communicated to petitioner more than 90 days prior to the commencement of the tax year in issue and gave as its reason that the application in question was not "filed within *258 90 days of the beginning of the taxable year." It does appear, however, as petitioner contends with plausibility in its reply brief, that the income it would have been required to report under a percentage of completion system would have included only the proportionate amount of total payments which reflected work actually done. This, of course, would eliminate the present problem; and if so, it may, on the one hand, rebut any suggestion that there was no method by which petitioner could legally record its actual income and, on the other, furnish the explanation why in situations of this kind no contention like the present appears in the discoverable authorities. That the petitioner has been unable to suggest precedents in its favor, and that neither party has produced a case precisely in point seems to us a powerful rejoinder to the contention that what was done here was either ordinary and usual accounting practice, or a requirement for the accurate reflection of petitioner's net income. The absence of earlier instances in the law books dealing with situations of this character is most easily explained on the assumption that it is not usual or frequent for bookkeepers to indulge *259 in such a practice. On the contrary, in both theory and result there is every probability that a distortion of income would follow upon the adoption of such a procedure. Petitioner's accounting witness was requested to state his theory as to how subsequent accruals for obligations incurred upon performance of the work in question should be treated. He answered: There would be a liability for that $327,500 for work and materials actually done and incurred. And since there was no additional cost it would merely mean a transfer from this account that we call in the tax return * * * "liability to restore property under contract" * * *
In other words, you close that account out? The Witness: We would close that account out and merely substitute for that a liability for the work that had been done but not paid for. The evidence falls short of establishing definitely that this theory in fact was followed or to what extent, if any, there ever were made against the accrued future liability any counter-balancing entries for liabilities actually incurred for the work in question. Of course, if this was not done, it would tend to distort income for later years by presenting petitioner at *260 that time with the equivalent of a double deduction; and even though, upon the termination of the entire contract after a number of years, a balancing entry were made, the failure to make current entries from year to year as liability for the work itself was incurred, and the corresponding failure to eliminate from accrual the cost items already compensated for, would tend to distort the income of the intervening years. But even if the theory had been followed, there still remains the inescapable necessity of distinguishing between the subsequent or new account for liabilities actually incurred which on its face would appear to be a proper and traditional accrual, and the earlier account which petitioner here seeks to deduct, which obviously was of a character so different that the creation of the new account would necessitate the elimination of the old, and which in this respect appears to partake more nearly of the characteristics of a reserve. In other words, if there were a reasonably safe and certain method for accomplishing petitioner's purpose, and at the same time securing the protection of the revenue by providing against future distortion of income through debits of periodic *261 accruals of expenses already deducted, it would seem to be by some system of reserve accounting. This is accordingly no mere matter of the choice of words, but a substantive proposition of real significance. Yet the treatment employed by petitioner upon the approval of which it now insists is to deduct the disputed items as incurred liabilities. They were not originally characterized as reserves and it is with some asperity that petitioner rejects the attempt to place them in that category now. It says, for example, in its reply brief: The use by respondent of the expression "reserve for unincurred costs" is completely unwarranted, since the items being discussed are accruals of incurred costs." On the trial hereof, respondent also tried (unsuccessfully) to inject the question of reserves into this case and now does so again. We are thus precluded from considering whether a reserve under such circumstances might eliminate some of the objections to the procedure to which petitioner has resorted. For a reserve account placed upon the books of the petitioner would necessarily continue to appear thereon until by counter-balancing entries it had been written off. There might thereby *262 be furnished some assurance that when by subsequently incurred expenses petitioner's forecast of future costs actually materialized, they would furnish the occasion for offsetting items in the reserve rather than for deductions from current income, the final outcome of which would enable both petitioner and respondent to avoid duplicating deductions and to give appropriate treatment to any closing balance, so that ultimately the exact financial result of the contract could be reflected in the tax returns. But the continued resistance to the concept of a reserve makes any such eventuality seem unlikely. We remain for this additional reason unpersuaded that the treatment adopted by petitioner was necessary for an accurate reflection of its income. Dealing, as we must, with the narrow issue before us, and laying to one side any speculation concerning the correctness of the gross income reported or the effectiveness that might otherwise have been contributed by the use of a completed contract, or percentage of completion, or even reserve, system, we reach the result that petitioner's claim in the form presented to us cannot be sustained. Decision will be entered for respondent. *263